IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

STEPHEN ARNOUX,

      Defendant.

CRIMINAL ACTION NO.
1:21-CR-00138-ELR-LTW

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is before the Court on Defendant Stephen Arnoux's ("Defendant") Motion to Suppress Statements ([Docs. 15, 22]). On September 8, 2021, the undersigned held a <u>Jackson</u>-<u>Denno</u>[1] hearing regarding Defendant's Motion to Suppress Statements. Defendant filed a post-hearing brief in support of the Motion ([Doc. 22]), the Government filed its Response ([Doc. 23]), and Defendant filed his Reply ([Doc. 26]). For the reasons outlined below, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress be **GRANTED in part and DENIED in part**, as explained below.

## BACKGROUND

On November 5, 2020, at approximately 3:47 AM, Detective Justice Bailey

---

[1] <u>Jackson v. Denno</u>, 378 U.S. 368 (1964)

observed a vehicle being driven by Defendant "swerving on the roadway," going onto the shoulder and over the center lane into oncoming traffic.  See [Doc. 21 ("Tr.") at 13:15–17].  The dashcam footage from Detective Bailey's vehicle introduced during the hearing confirms Detective Bailey's testimony.  See [Gov. Ex. 1 "Bailey Dash Cam" 0:20–1:04].  Detective Bailey tried to pull the vehicle over for failing to maintain a lane, but Defendant kept driving for a "couple of miles" before stopping.  [Tr. at 14:2–16:1]; see also [Gov. Ex. 1 "Bailey Dash Cam" 1:36–3:00].  In Detective Bailey's experience, drivers who fail to pull over are "either trying to hide something or they're trying to find a place to go to leave the vehicle."  [Tr. at 15:7–10].

Eventually, Defendant pulled into the driveway of his girlfriend's residence.  See [Gov. Ex. 1 "Bailey Dash Cam" 2:30–45].  Detective Bailey drew his firearm, pointed it in Defendant's direction, told Defendant to keep his hands out of the car window, and waited for backup to arrive.  [Gov. Ex. 1 "Bailey Body Cam" 2:42–4:35].  Once another officer was on the scene, Detective Bailey holstered his weapon, had Defendant walk over to a patrol car, and placed Defendant in handcuffs.  [Gov. Ex. 1 "Bailey Body Cam" 4:32–5:16].  Detective Bailey testified that Defendant was handcuffed for "everybody's safety" because "at that time [the officers] didn't know if anyone else

was in the vehicle." [Tr at 18:7–13]. Other officers checked the vehicle and determined there were no other occupants. [Id. at 19:3–8].

Detective Bailey told Defendant he was "being detained" because he "didn't stop." [Gov. Ex. 1 "Bailey Body Cam" 5:15–20]. When Defendant said he decided not to stop until he got to his girlfriend's house, Detective Bailey told Defendant "we don't [continue driving] whenever the police are pulling us over," "all I care about is you didn't stop," and "I'm about to make an example is what's gon' happen." [Id. 5:15–6:24]. During this exchange, Detective Bailey retrieved Defendant's wallet to get his identification so Detective Bailey could check for warrants and make sure Defendant had a valid license. [Id. 5:33–53]. While running Defendant's driver's license, Detective Bailey noticed that the wallet smelled of raw marijuana. [Tr. at 20:15–24]. Detective Bailey asked Defendant if he had been smoking, and he stated he had not. [Id.]. Detective Bailey noticed that Defendant smelled strongly of cologne. [Id. at 21:7–8]. When Detective Bailey approached the vehicle, which had the driver's side door ajar, he smelled marijuana and either "blunt spray" or cologne-type smell coming from the vehicle. [Id. at 21:12–22]; see also [Gov. Ex. 1 "Bailey Body Cam" 9:10]. Based on his training and experience, Detective Bailey was aware that blunt

3

spray is a liquid spray made in various scents that is made, and often used, to cover the odor of marijuana.  [Tr. at 21:23–22:10].

Based on his observations, Detective Bailey searched the vehicle.   See [Tr. 22:25–23:6].   During the search, Detective Bailey found a pistol between the driver's seat and center console.  [Id. at 23:7–14].   A record check revealed that Defendant had a previous felony conviction, and Detective Bailey arrested Defendant. [Id. at 24:19–25:5].   At no point did Detective Bailey read Defendant a Miranda[2] warning.  [Id. at 25:3–5].   As part of the arrest, Detective Bailey searched Defendant and found $5,220 in cash in Defendant's pocket.  [Gov. Ex. 1 "Bailey Body Cam" 30:18–21].  Defendant immediately responds, "Let me go home to my kids, man, I got six kids and I take care of all of them."  [Id. 30:20–27].  Thereafter, Defendant told the officers to give the money and the car keys to his girlfriend.  [Id. 30:38–32:20].  Later, in the back seat of the patrol car, Defendant said to Detective Bailey, "you could of took everything in my . . . pocket" and "you could'a had everything in my damn pocket man."  [Gov. Ex. 1 "Bailey Backseat of Patrol Car" 44:55–45:07].

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

## DEFENDANT'S MOTION TO SUPPRESS

Defendant argues: (1) Detective Bailey lacked probable cause to search his vehicle, (2) that the vehicle was not subject to a warrantless search because it was parked in the "curtilage" of his girlfriend's home, and (3) that his statements were made without receiving a Miranda warning or were otherwise involuntary. [Doc. 22 at 3–7]. The undersigned addresses each argument in turn.[3]

### A.    Whether Detective Bailey had Probable Cause for the Search

The Fourth Amendment secures the right "against unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  Thus, as the Supreme Court has noted, the Fourth Amendment contains a "strong preference for searches conducted pursuant to a warrant." Illinois v. Gates, 462 U.S. 213, 236 (1983).  But not all warrantless searches are unconstitutional.  "For a warrantless search of an automobile to be constitutional, '(1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime.'" United States v. Delva,

---

[3] The Government argues that Defendant has not established standing to contest the search of the vehicle.  [Doc. 23 at 8–11].  Because the undersigned concludes that the search of the vehicle was lawful, it is unnecessary to reach this argument.

922 F.3d 1228, 1243 (11th Cir. 2019) (quoting United States v. Lanzon, 639 F.3d 1293, 1299–300 (11th Cir. 2011)).  There is no question Defendant's vehicle was readily mobile, as he used it to flee from police for several miles immediately before his arrest. [Tr. at 14:2–16:1].  The question then is whether Detective Bailey had probable cause to search the vehicle.  Defendant argues Detective Bailey's search of the car "was completely unsupported by probable cause" because Detective Bailey "had *zero* information that the vehicle smelled of marijuana."  [Doc. 22 at 3].  Defendant's argument falls short on both the facts and the law.

Factually, Defendant contends that Detective Bailey did not say "he smelled marijuana coming from the vehicle" at until "the evidentiary hearing" and that he "did not tell [Defendant] that his car smelled like marijuana."  [Id. at 3–4].  A review of the evidence reveals that at the time of the arrest, Detective Bailey repeatedly told Defendant that the car "smelled like weed" and he noted the fact in his contemporaneous arrest report.  [Gov. Ex. 1 "Bailey Body Cam" 29:45–30:30]; see also [Tr. at 46:15–47:7].  Contrary to Defendant's argument, the video evidence does not contradict Detective Bailey's testimony.

Legally, regardless of whether the vehicle itself smelled of marijuana, Detective Bailey had probable cause to search the vehicle.  "Probable cause exists to conduct a

6

warrantless search when 'there is a fair probability that contraband or evidence of a crime will be found in the vehicle' under the totality of the circumstances." Delva, 922 F.3d at 1243 (quoting United States v. Tamari, 454 F.3d 1259, 1261-62 (11th Cir. 2006)).  As the Supreme Court has noted, "probable cause is a fluid concept—turning on the assessment or probabilities in particular factual contexts—not readily or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232.  But the opinions and conclusions of an experienced agent may properly be considered as a factor in the totality of the circumstances for evaluating whether there is probable cause to support a search warrant.  See United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995); United States v. Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990).

As Defendant admits, Detective Bailey noticed that Defendant's wallet smelled of marijuana although the wallet itself did not contain any marijuana.  See [Doc. 22 at 3].  The fact that Defendant's wallet smelled of marijuana but did not contain any suggests "a fair probability" that marijuana may have been recently taken out of the wallet.  And the most recent place where Defendant could have hid narcotics was in his car.  Also, when talking about the smell of marijuana coming from Defendant's wallet and explaining his reason for searching the vehicle, Detective Bailey explicitly noted the smell of "blunt spray cover up" coming from the vehicle. [Gov. Ex. 1 "Bailey

Body Cam" 13:55–14:03].  Defendant correctly contends that "the perceived smell of scented spray" alone does not establish probable cause.  [Doc. 26 at 3].  The perceived smell of scented spray was not the only fact establishing probable cause.  As previously noted, Defendant's wallet smelled of marijuana even though there was no marijuana found in the wallet.  Also, Defendant fled from the police for miles after Detective Bailey attempted to pull him over.  [Tr. at 14:2–16:1].  As Detective Bailey testified, in his experience when a driver fails to pull over, they are sometimes "trying to hide something."  [Id. at 15:7–10].

Thus, the facts known to Detective Bailey at the time he decided to search the vehicle were, at a minimum, as follows.  Defendant fled from police, which indicated to Detective Bailey Defendant may be "trying to hide something."  [Id. at 15:7–10].  Defendant's wallet smelled of raw marijuana but did not contain any raw marijuana. See [Gov. Ex. 1 "Bailey Body Cam" 13:55–14:03].  And Defendant's vehicle smelled of "blunt spray cover up."  [Id.].  As the Supreme Court has emphasized, "probable cause is a flexible, common-sense standard" that "does not demand any showing that [an officer's] belief be correct or more likely true than false."  Texas v. Brown, 460 U.S. 730, 742 (1983).  Therefore, the undersigned concludes that the totality of the circumstances discussed above established "a fair probability that contraband or

evidence of a crime [would] be found in the vehicle," and thus Detective Bailey had probable cause to search the vehicle.  See Delva, 922 F.3d at 1243.

**B.**   **Whether Defendant's Vehicle was within the Curtilage of the Home**

The automobile exception does not permit "the warrantless search of a vehicle anytime, anywhere."  See Collins v. Virginia, 138 S. Ct. 1663, 1673 (2018).  Special protection is afforded to the home, and "the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein."  Id. at 1675.  Defendant argues the automobile exception does not apply—and that no other exceptions apply—because the vehicle "was parked in the driveway of the home belonging to [his] girlfriend."  [Doc. 22 at 5–6]; see also [id. at 4–5].  Defendant also contends that "because the vehicle was legally parked in the driveway of [his] girlfriend's home, a search warrant was necessary," but Collins does not stand for such a sweeping proposition.  See [Doc. 22 at 6].

As noted above, the Collins Court held that a warrant is required to search a vehicle if the vehicle is "parked within a home or its curtilage."  138 S. Ct. 1672.  While the Collins Court held that "the part of the driveway where Collins' motorcycle was parked and subsequently searched is curtilage," that does not mean that all parts of every driveway are part of the curtilage of a home.  See id. at 1670–71.  "Questions

9

about whether an area is curtilage 'should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.'" United States v. Stephen, 823 F. App'x 751, 754 (11th Cir. 2020) (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)). The only one of these factors Defendant addresses is the first, arguing that the driveway was "attached" to his girlfriend's home. See [Doc. 26 at 3–4]; see also [Doc. 22 at 5–6]. Defendant overlooks the other three factors, which weigh heavily against a finding that the part of the driveway where he was parked was "curtilage."

In Collins, the motorcycle at issue was in "a portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house." 138 S. Ct. at 1670. Here, by contrast, the vehicle was not within an enclosure of any kind. [Gov. Ex. 1 "Bailey Body Cam" 9:03–9:10]. Nor was the vehicle parked behind the front perimeter of the house; it was less than ten feet from the street and there were no "steps taken by the resident to protect the area from observation by people passing by.'" See Stephen, 823 F. App'x at 754. Last, in Collins the part of the driveway at issue was secluded and a

"visitor endeavoring to reach the front door of the house would have [to] turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch." 138 S. Ct. at 1671.  As evidenced by Detective Bailey's bodycam footage, it was impossible to reach the front door of Defendant's girlfriend's house without walking directly past where Defendant was parked.  [Gov. Ex. 1 "Bailey Body Cam" 9:03–9:10].

In short, this case is significantly distinguishable from Collins.  Instead, this case is akin to Stephen where a panel of the Eleventh Circuit rejected an argument strikingly similar to Defendant's.  In Stephen, like here, the first Dunn factor provided "some support" for the defendant's argument because the vehicle was—by necessity of the short driveway—"not far from the house."  823 F. App'x at 755.  But the remaining factors weighed conclusively against a finding that the driveway was part of the curtilage of the home.  "The driveway was not gated, covered, enclosed, or partly enclosed."  Id.  The homeowner "made no effort to conceal the driveway from passersby."  Id. And "the driveway formed part of the path that visitors would naturally take to walk to the front door—a pathway led from the upper end of the driveway to the front porch."  Id.  In this case, the part of the driveway where Defendant was parked was not within the curtilage of the home, and thus the automobile exception applies.

See id.; see also United States v. Rauda-Constantino, No. 1:18-CR-00203-AT-JSA, 2019 WL 7838968, at *18 n.7 (N.D. Ga. Aug. 6, 2019), *report and recommendation adopted*, 2020 WL 469675 (N.D. Ga. Jan. 28, 2020) (holding that the location where the defendant's vehicle was parked was "significantly distinguishable" from the location considered in Collins because the defendant was "parked at the end of a wide-open and highly visible driveway, close to the street itself").

## C.    Whether Defendant's Statements are Admissible

As an initial matter, the undersigned concludes that the Government has met its burden of establishing that Defendant's statements were "voluntary." See United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) ("The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary."). A finding that Defendant's statements were involuntary turns on whether "the circumstances show that 'coercive police activity' overcame the defendant's free will." Arvelo v. Sec'y, Fla. Dep't of Corr., 687 F. App'x 901, 904 (11th Cir. 2017) (quoting Colorado v. Connelly, 479 U.S. 157, 163–64 (1986)). "Voluntariness is determined by an assessment of the totality of the circumstances, but that assessment must include an element of official overreaching to warrant a conclusion that a confession is involuntary under constitutional law." Miller v. Dugger, 838 F.2d 1530,

1536 (11th Cir. 1988). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." Id.

As will be discussed below, Detective Bailey did draw his weapon on Defendant, but he was justified in doing so and holstered his weapon as soon as Defendant was secured. Detective Bailey also placed Defendant in handcuffs, and there were numerous officers on the scene. But there were no threats or promises made, the encounter was relatively short, and the officers did not engage in the kind of physical or psychological coercion that would render Defendant's statements involuntary. See, e.g., Mincey v. Arizona, 437 U.S. 385, 398–401 (1978) (holding a confession was involuntary where the hospitalized defendant was interrogated for four hours, even though he repeatedly asked the officer to stop until he could get a lawyer); Beecher v. Alabama, 389 U.S. 35, 36–37 (1967) (holding a confession obtained after the defendant was shot in the leg was involuntary because one of the officers threatened to kill the defendant and the other officer fired a rifle next to the defendant's ear). In his reply, Defendant does not argue the Government failed to meet its burden of showing his statements were voluntary. See [Doc. 26].

Defendant's argument turns on whether his statements were obtained in violation of Miranda.[4]  Miranda protects a defendant's "Fifth Amendment privilege against self-incrimination by requiring law enforcement authorities to advise a [defendant] subject to custodial interrogation of certain rights." United States v. Bernal-Benitez, 594 F.3d 1303, 1318 (11th Cir. 2010).  Thus, to decide whether Miranda was violated, the Court must determine whether Defendant was "in custody" and, if so, whether he was subject to "interrogation."  See United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) ("Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'") (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

In determining if a person is "in custody" within the meaning of the Fifth Amendment "the ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'" United States v. Phillips, 812 F.2d 1355, 1359 (11th Cir. 1987) (quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)).  In deciding whether a

---

[4] Defendant also contends that any statements occurring after the "illegal search" of the vehicle should be suppressed.  [Doc. 22 at 7].  Because the search was not "illegal," as discussed above, this argument fails.

detention rises to the level "associated with a formal arrest," the Court considers a variety of factors such as whether the officers brandished weapons, touched the suspect, used language or a tone that indicated that compliance could be compelled, and the location and length of the detention.  United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010).   The determination is made "under the totality of the circumstances."  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).  And because the test is objective, the subjective beliefs of the Defendant and the interviewing officers are irrelevant.  See Berkemer v. McCarty, 468 U.S. 420, 442 n.35 (1984).

The case at bar presents a close call. Defendant's contention that the encounter occurred "in a fairly rural part of town" is belied by the video evidence, which shows a few dozen townhomes in the area where Defendant ultimately stopped.  See [Doc. 26 at 5]; see also [Gov. Ex. 1 "Bailey Body Cam"].  Even if the area were "fairly rural," that fact matters little since the area was specifically chosen by Defendant because it was "the familiar and comfortable surroundings of his girlfriend's" neighborhood.  See Brown, 441 F.3d at 1349.  On the other hand, Defendant is correct that the encounter "occurred on a dark street, late at night."  [Doc. 26 at 5].  And after being placed in handcuffs Defendant was surrounded by two to four police officers.  See [Gov. Ex. 1

"Bailey Body Cam" 9:15–23]. Importantly, whatever comfort Defendant might have been provided by being near his girlfriend's home was substantially lessened by the fact that Detective Bailey told Defendant's girlfriend to "go in the house" and repeatedly yelled at her to "shut the door" with his gun pointed in her direction. [Id. 2:38–58].

The gun was also pointed in Defendant's direction for approximately two minutes. [Id. 2:42–4:35]. While brandishing a weapon at a person imposes a great deal of restraint on their freedom of movement, "the use of a gun does not *automatically* convert an investigatory stop into an arrest." United States v. Roper, 702 F.2d 984, 987 (11th Cir. 1983) (emphasis in original). In Roper, the officer "did not act unreasonably in drawing his gun" where he "was alone, approaching a vehicle with two adult males inside, one of whom was possibly a federal fugitive." Id. at 988. Here, there was only one person in the car and there was nothing to indicate Defendant was a federal fugitive, but Detective Bailey was alone at the time he was pointing his gun at Defendant and Defendant had just fled from Detective Bailey for several miles. Under the circumstances, the Court cannot say that Defendant's seizure was converted into an arrest simply because Detective Bailey pointed a gun in Defendant's direction for approximately two minutes.

After the gun was holstered, Defendant was immediately placed in handcuffs. [Gov. Ex. 1 "Bailey Body Cam" 4:32–5:16].  Another officer also touched Defendant, apparently imposing light restraint, while Detective Bailey put the handcuffs on.  [Id.]. Again, touching a person and putting them in handcuffs imposes a restraint on their freedom of movement but is not determinative of whether an "arrest" has occurred. United States v. Lester, 477 F. App'x 697, 700 (11th Cir. 2012) (holding that "an investigatory stop does not ripen into an arrest simply because an officer handcuffs a suspect").  Officers "may take reasonable action, based upon the circumstances, to protect themselves during investigative detentions" and putting a person in handcuffs can be reasonable if it is "designed to provide for the safety of the agents."  United States v. Hastamorir, 881 F.2d 1551, 1556–57 (11th Cir. 1989).

Here, Detective Bailey testified that Defendant was put in handcuffs for "everybody's safety" because "at that time [the officers] didn't know if anyone else was in the vehicle."  [Tr at 18:7–13].  The Court finds this explanation unpersuasive for a number of reasons.  First, as Defendant was being placed in handcuffs, Detective Bailey asked if anyone else was in the car and Defendant told him there was not.  [Gov. Ex. 1 "Bailey Body Cam" 5:00–07].  If there was any doubt whether Defendant was being truthful, other officers confirmed there was no one else in the car less than 30

seconds after Defendant was placed in handcuffs. See [id. 5:07–30]. Yet, Defendant was still handcuffed over twenty minutes later when he was finally, formally told he was under arrest. [Id. at 28:07–14].

Second, at the time Detective Bailey was putting the handcuffs on Defendant, he offered a different reason for the detention: "because [Defendant] didn't stop." [Id. 5:10–16].[5] Third, Detective Bailey's subsequent statements to Defendant further indicate Defendant was being punished for not stopping rather than being handcuffed for safety reasons. See, e.g., Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1306 (11th Cir. 2006) (holding that an officer violated a suspect's Fourth Amendment rights by placing her in handcuffs when there was no longer "a potential threat to anyone's safety" and the handcuffing was done "to persuade her to get rid of her disrespectful attitude and to impress upon her the serious nature of committing crimes"). Within approximately one minute of placing Defendant in handcuffs, Detective Bailey told Defendant "we don't [continue driving] whenever the police are pulling us over," "all I care about is you didn't stop," and crucially "I'm about to make an example is what's

---

[5] As the Government correctly notes, Defendant was told he was being "detained," not arrested. [Gov. Ex. 1 "Bailey Body Cam" 5:10–16]. But as Defendant correctly notes, Defendant was not told that he was *not* under arrest. This factor is, at best, a wash.

gon' happen."  [Id. 5:15–6:24].

To be sure, the subjective beliefs of Detective Bailey are not relevant to whether Defendant was "in custody."  See Berkemer, 468 U.S. at 442 n.35.[6]  But the "language or a tone" used by Detective Bailey does matter and would have indicated to an objectively reasonable person that "compliance with the officers could be compelled." See United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989).  Under the totality of the circumstances, the undersigned concludes that Defendant was "in custody" at or around the time that Detective Bailey said he was "about to make an example" out of Defendant.  See [Gov. Ex. 1 "Bailey Body Cam" 6:16–6:28].

But Defendant is not entitled to suppression of his statements simply because he was "in custody" and Miranda warnings were not given.  Suppression is only warranted if Defendant's statements were "elicited . . . through interrogation."  Adams, 1 F.3d at 1575.  The problem with trying to rule on the present motion is that both sides are

---

[6] Similarly, Detective Bailey's subjective beliefs and reasons do nothing to alter the probable-cause analysis above in Section A.  Whether there is probable cause for a search "is determined objectively, and not by the subjective conclusions of the law enforcement officer."  United States v. Roy, 869 F.2d 1427, 1432 (11th Cir. 1989). Even if the officer "did not personally believe probable cause existed until after the search began," the search is still legally justified as long as probable cause existed in an objective sense.  Id. at 1432–33.  As discussed above, Detective Bailey objectively had probable cause to search the vehicle, regardless of his subjective motivations.

vague about what statements they want to have suppressed or admitted.  Defendant simply says his "statements" were made "without being given proper Miranda warnings."  [Doc. 22 at 7].  Defendant never shows, in his initial brief at least, that he was *entitled* to a Miranda warning and fails to explain what "statements" should be suppressed.  [Id.].  The Government's response is not much clearer.  While the Government does at least point to evidence to support its position, the Government does not adequately explain what statements it might seek to admit at trial.

For example, the Government simply says that "[a]ll of the statements" Defendant made prior to approximately 37 or 38 minutes into the encounter "were not made in response to any questioning."  See [Doc. 23 at 24]; see also [Gov. Ex. 1 "Bailey Body Cam" 37:16–37]; [Gov. Ex. 1 "Bailey Backseat of Patrol Car" 38:20–40].  But the Government's assertion that "Detective Bailey was merely stating facts that could not have been anticipated to lead to incriminating responses" is unavailing.  See [Doc. 23 at 24].[7]  During the portion of the video cited by the Government, Detective

---

[7] Of course, Miranda applies "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted).

Bailey says, "Alright, so I got your wallet and then I got your gun," and Defendant responds, "Exactly."   [Gov. Ex. 1 "Bailey Backseat of Patrol Car" 38:22–27]. Ostensibly, Officer Bailey is simply confirming an inventory of what was seized, and questions "reasonably related to the police's administrative concerns" fall outside the scope of Miranda.  Pennsylvania v. Muniz, 496 U.S. 582, 601–02 (1990).  But "[e]ven questions that usually are routine must be proceeded by Miranda warnings if they are intended to produce answers that are incriminating."  United States v. Glen-Archila, 677 F.2d 809, 816 (11th Cir. 1982).

Officer Bailey knew Defendant was a convicted felon at the time he made the statement and knew that asking Defendant to confirm Officer Bailey had "[Defendant's] gun" was likely to elicit an incriminating response.  Indeed, the conversation immediately turned to the warrant for Defendant's arrest and Detective Bailey said, "This thing's probably stolen isn't it?"  [Gov. Ex. 1 "Bailey Backseat of Patrol Car" 38:37–40].  When Defendant responded that the gun was "legit," Detective Bailey asked, "Where did you get it from?" and "How'd you buy a gun?"  [Id. 38:40–49].  Detective Bailey subsequently told Defendant to "not be saying that" after Defendant admitted to participating in a straw purchase, but the admonition rings hollow since Detective Bailey had just elicited the incriminating responses.  [Id. 38:49–

56].  Thus, while Detective Bailey's statement "I got your gun" appears on its face to be a routine administrative question, under the circumstances, the undersigned concludes it was used as part of an interrogation to get Defendant to provide incrimination responses.

The Government also argues Defendant's "post-arrest questions to Detective Bailey should not be suppressed," but fails to adequately make clear what "post-arrest questions" it is referring to.  See [Doc. 23 at 24].  The only other specific statement the Government points to is Defendant's alleged attempt to "bribe" Detective Bailey.  See [id. at 25].  In searching Defendant incident to the arrest, Detective Bailey found $5,220 in cash in Defendant's pocket.  [Gov. Ex. 1 "Bailey Body Cam" 30:18–21].  Defendant immediately responds, "Let me go home to my kids, man, I got six kids and I take care of all of them."   [Id. at 30:20–27].   The Government suggests Defendant was "attempting to bribe Detective Bailey" at that point.   See [Doc. 23 at 25].   But Defendant clearly and repeatedly says he wants the money and the car keys to go to his girlfriend.  [Gov. Ex. 1 "Bailey Body Cam" 30:38–32:20]. Thus, it is unclear as to whether Defendant's statements were an attempt at bribery.

Later, while in the backseat of Detective Bailey's patrol car, Defendant says, "you could of took everything in my . . . pocket" and "you could'a had everything in

my damn pocket man." [Gov. Ex. 1 "Bailey Backseat of Patrol Car" 44:55–45:07].

Even in context, Defendant's arguments that he was talking about being "quickly

bonded out" and that he "was merely expressing his desire to make this process go as

quickly as possible" are hardly believable. See [Doc. 26 at 7]. But Defendant is correct

that his statement in the back of the patrol car was phrased in the hypothetical and in

the past tense. At the time Defendant made the statement, he had nothing in his pocket

with which to bribe Detective Bailey. Defendant may have been suggesting that he

*would have* bribed Detective Bailey, but he was not presently attempting to bribe

Detective Bailey and had no means to do so. As such, the cases relied on by the

Government are inapposite and the statements are not admissible on the grounds

articulated by the Government. See [Doc. 23 at 25].

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's

Motion to Suppress ([Docs. 15, 22]) be **GRANTED in part and DENIED in part**.

Specifically, the undersigned recommends that Defendant's motion be denied to the

extent he challenges the search of his vehicle and granted to the extent he seeks

suppression of certain statements obtained in violation of Miranda. There are no other

pending matters before the Magistrate Judge, and the undersigned is aware of no

problems relating to the scheduling of this case.  **IT IS FURTHER ORDERED** and

**ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

     **SO ORDERED, REPORTED, AND RECOMMENDED**, this  _14_  day of

February, 2022.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE